SISTERS OF ST. FRANCIS HEALTH
SERVICES, INC., Plaintiff,

v.

Richard SCHWEIKER, Secretary of
Health and Human Services,
Defendant.

Civ. A. No. 78–0968.

United States District Court,
District of Columbia.

May 27, 1981.

Roger L. Levy, Villanova, Pa., and J. D.
Epstein, Philadelphia, Pa., for plaintiff.

Asst. U. S. Atty. Cheryl M. Long, Washington, D. C. and David Palmer, H.E.W.,
Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HART, District Judge.

The Court adopts the following Findings
of Fact and Conclusions of Law in the
above-captioned case.

### I.

### FINDINGS OF FACT

1.1 Sisters of St. Francis Health Services, Inc. ("Plaintiff"), is a not-for-profit
corporation existing under the laws of the
State of Indiana. Plaintiff owned and operated St. Joseph Hospital (the "hospital"),
which was an 86-bed, short-term, acute care
hospital located in Logansport, Indiana.
The hospital was a "hospital" as defined in
Section 1861(e) of the Medicare Act [42
U.S.C. § 1395x(e)], and was a "provider of
services" participating in the Medicare program within the meaning of Section 1861(u)
of the Medicare Act [42 U.S.C. § 1395x(u)]
and 42 C.F.R. § 405.605.

1.2 Defendant Richard Schweiker, Secretary of Health and Human Services
("Secretary"), or his predecessors in office,
was and now is the federal officer responsible for the administration of the Medicare

Act. The Secretary is designated as a real party in interest by 42 C.F.R. §§ 405.651(c) and 405.1877.

1.3 The Medicare Act establishes a system of health insurance for the aged and the disabled. Under the Medicare Act, an eligible Medicare beneficiary is entitled to have payment made by the Medicare Program on his behalf for, *inter alia*, inpatient and outpatient hospital services provided to him or her by a hospital participating in the Medicare Program as a "provider of services" under 42 U.S.C. § 1395x(u). Payment to participating providers of services for hospital services which are rendered to Medicare beneficiaries and which are covered services under the provisions of the Act is made by defendant Secretary through "fiscal intermediaries." 42 U.S.C. § 1395h. The amount of that payment is required by statute to be the lesser of the "reasonable cost of such services" or "the customary charges with respect to such services." 42 U.S.C. § 1395f(b).

In the event that a fiscal intermediary makes adjustments to a Medicare provider's cost report for a cost reporting period ending on or after June 30, 1973, that are disputed by a provider, and at least $10,-000.00 is in controversy, the provider may appeal the disputed adjustments to the Provider Reimbursement Review Board (hereinafter referred to as the "PRRB"). 42 U.S.C. § 1395oo. The PRRB is a five-person board, all of the members of which are required by statute to be "knowledgeable in cost reimbursement," and at least one of the members of which must be a certified public accountant. 42 U.S.C. § 1395oo(h).

1.4 In 1893 Plaintiff opened the health care facility known as St. Joseph Hospital in Logansport, Indiana. (Record at 557).

1.5 It served the public continuously from that date until December 31, 1974 when it officially closed. (Record at 573). Plaintiff acquired its present site in 1906 and, on July 14, 1909 after a period of construction, dedicated a four-story brick structure with a capacity of 60 beds. The facility stood as erected for 52 years subject only to normal maintenance. Plaintiff did, however, make numerous improvements inside the hospital in keeping with modern trends in hospital equipment and patient care. The structure itself, however, was given normal maintenance. (Record at 558).

1.6 With the passage of time, due to numerous deficiencies, the hospital failed to meet fire and safety standards. In addition, time rendered Plaintiff's facility physically and functionally obsolete. Thus, in 1958, Plaintiff began planning a construction project. On December 4, 1960, the hospital completed construction of a $1,200,-000 L-shaped wing, which increased the hospital's bed capacity from 60 to 144 beds. (Record at 558).

1.7 Following construction of the new wing, the 1909 section of the facility was still in violation of fire/safety standards yet contained 60 beds, the surgical suite, X-ray room, emergency room, obstetrical department, central supply, laundry and kitchen. (Record at 558). Serious problems existed with regard to the boiler and boilerhouse and the plumbing. The roof was in need of substantial repair and possibly needed to be completely replaced. (Record at 559).

1.8 Plaintiff's fire-safety deficiencies and low patient utilization rates forces the closing of the surgery suite, emergency room, and obstetrical department in the original building in 1965. (Record at 559). In 1966, the hospital began participating in the Medicare program. (Record at 36). In 1967, Plaintiff discontinued using the beds in the old building as acute care beds and received licensing to use a portion of the old building for an extended care unit. In 1969, due to adverse financial consequences the hospital converted back exclusively to an acute care facility. (Record at 55).

1.9 Plaintiff's protracted low patient utilization caused the temporary closing of one floor of forty-two beds of its L-shaped wing in 1973. (Record at 36).

1.10 In November 1974, there were but two physicians admitting patients to the hospital on a regular basis, although a number of physicians remained on the active staff. (Record at 36).

1.11 In August 1974 and prior to closing operations, the hospital became ineligible to receive federal funding in the form of Hill-Burton funds to allow for improvements and renovations. (Record at 196). The Cass County Comprehensive Health Planning Agency voted, over the hospital's protest, to designate another hospital, Memorial Hospital, as the only general hospital eligible to receive Hill-Burton funds to improve its physical facility. (Record at 704).

1.12 Plaintiff's facility operated at a net operating loss every year from 1966 through 1974 with the exception of 1967. (Record at 562).

1.13 On December 31, 1974, the condition of Plaintiff's facility, its low patient utilization, lack of medical staff, annual financial losses, and inability to receive Hill-Burton funds, caused the Plaintiff to make a management decision to cease operations. (Record at 197).

1.14 Following its closing, the hospital administration kept a minimal maintenance staff on the premises to try to maintain the facility for possible sale. (Record at 200).

1.15 Following its closing, Plaintiff unsuccessfully attempted to sell the hospital that by 1974 consisted of eleven buildings located on 9.4 acres. (Record at 203–207). Plaintiff tried to sell the facility beginning in 1974, but the facility was not sold as of August 26, 1977, the date of the hearing before the PRRB. The reason the potential buyers lost interest in buying the facility was the cost of improvements needed at the facility. (Record at 211, 212).

1.16 In 1975, the facility was listed with a large realtor group in Chicago for $2,000,-000, but the asking price was later reduced to $1,000,000 and still later to $300,000. The realtor group sent out ten thousand letters and a picture of the property but did not locate a buyer. (Record at 212–213, 641).

1.17 During the middle of 1975, the county hospital in Logansport, Indiana (Memorial Hospital), retained a professional consultant to report on the feasibility of Memorial Hospital acquiring the St. Joseph Hospital plant and fixed and moveable assets. Following an indepth study of the St. Joseph Hospital facility, A. T. Kearney's recommendation to the county was "that Memorial Hospital should turn down St. Joseph Hospital, even if it is given to them." (Record at 564–565).

1.18 An option to purchase the facility was executed on December 20, 1976, and after a number of extensions, the option was due to expire on October 1, 1977. (Record at 207). The purchase price was set at $300,000 (of which $120,000 was the appraised value of the land in 1974) in the option sales contract executed between the Plaintiff and SJU Mortgage Co. (Record at 641). The option was expressly subject to the optionee obtaining certain commitments from the Department of Housing and Urban Development ("HUD"). The numerous requirements imposed by HUD concerning upgrading of the facility included installing a sprinkler system throughout the entire facility, removing the fifth floor of the 1909 building, building an entire new kitchen, reworking the entire sewer system, and removing and installing all new windows. (Record at 645–647).

1.19 Plaintiff's Certified Public Accountant determined that the net book value of the Plaintiff's buildings and movable equipment at December 31, 1974, as computed under the accelerated method of depreciation, totalled $807,478.00. (Record at 281).

1.20 In addition, Plaintiff sold movable equipment for approximately $2,000, transferred equipment appraised at $69,015.00 to another hospital within the religious order, and transferred certain equipment to its central office, during December 1976 and January 1977. (Record at 679, 564).

1.21 In its 1974 cost reporting period, the final cost report under the Program, the Plaintiff reported the value of the hospital plant and fixed and movable assets used in patient care activities as zero. (Record at 227).

1.22 As a result of the termination of operations of Plaintiff's hospital facilities and its termination of participation in the

Medicare program, the fiscal intermediary prepared an adjustment to the final Medicare cost report reducing allowable costs by the excess of accelerated depreciation previously claimed on the hospital's depreciable assets over the depreciation that would have been allowed on the straight-line method of depreciation, for all years that the hospital participated in the Medicare program. (Record at 757–758).

1.23 In its final Medicare cost report as amended, Plaintiff reported $37,737.24 in unemployment compensation payments, made subsequent to and as a result of termination of operations, as allowable costs. These costs represented reimbursement of the State of Indiana, on a dollar-for-dollar basis, for unemployment compensation benefits paid to former employees of Plaintiff, attributable to services with Plaintiff. The Intermediary disallowed the costs on the basis that such payments were paid subsequent to date of termination and thus were not allowable costs to Plaintiff. (Record at 717).

1.24 In its final Medicare cost report as amended, Plaintiff reported some $15,299.84 in pension plan payments and $435.00 in administrative expenses relating thereto, made subsequent to and as a result of termination of operations, as allowable costs. The Intermediary disallowed such costs on the basis that the costs were paid subsequent to the date of termination, and thus were not allowable costs to Plaintiff. (Record at 721).

1.25 The Intermediary applied the limitation on reimbursement to the lesser of reasonable costs or customary charges to Plaintiff's final Medicare cost report. (Record at 714).

1.26 Pursuant to 42 U.S.C. § 1395oo(f) and 42 C.F.R. §§ 405.1801 et seq., Plaintiff appealed certain adverse determinations of its intermediary to the PRRB. The adverse determinations, which applied to the hospital's Medicare cost report for its final year of operation, ending December 31, 1974, specifically included the following determinations:

a. that Plaintiff was not entitled to reimbursement for a loss on disposal of its assets, including its hospital plant and fixed and moveable assets;

b. that Defendant would recapture the excess of accelerated depreciation taken on Plaintiff's hospital plant and fixed and moveable assets over the depreciation that would have been allowable under the straight-line method of depreciation for all years that the hospital participated in the Medicare program;

c. that Plaintiff was not entitled to reimbursement for unemployment compensation costs paid to the State of Indiana after December 31, 1974, the date of termination of the hospital's operations and its participation in the Medicare program;

d. that Plaintiff was not entitled to reimbursement for pension plan cost paid after December 31, 1974, the date of termination of the hospital's operations and its participation in the Medicare program; and

e. that the limitation on reimbursement to the lesser of the "reasonable cost of such services" or "the customary charges with respect to such services" would apply to the hospital's year of termination of operations, and would apply to certain costs which if reported on the December 31, 1974, cost report were nonetheless attributable in part to services rendered in prior cost reporting periods. (Record at 749).

1.27 A hearing was held before the PRRB on August 26, 1977. Based upon the written submissions of Plaintiff and the intermediary, and upon oral testimony of witnesses at the hearing, the PRRB issued a decision that:

a. The Intermediary's adjustment to disallow a loss on disposition of assets is reversed, since the facility had been constructively abandoned within one year of termination of participation [in the Medicare program].

b. The Intermediary's adjustment to recapture the excess of accelerated depreciation over straight-line depreciation when the Provider terminated participation in the Medicare program is affirmed. This recovery is to be determined and applied before giving effect to the decision on Issue No. 1.

c. The Intermediary's adjustment to disallow certain costs of unemployment compensation is reversed.

d. The Intermediary's adjustment to disallow certain pension payments and expenses is reversed.

e. The Intermediary's adjustment to apply the principle dealing with the lower-of-cost-or-charges to the Provider's year of termination is affirmed. However, only that portion of unemployment compensation and pension costs relevant to the termination year should be included in that year. The remainder of such costs relevant to prior years should not be included in the final year when applying the lower-of-costs-or-charges principle. (Record at 111–151).

1.28 On February 14, 1978, the Administrator of the Health Care Financing Administration ("Administrator") issued notice that it would review the decision of the Provider Reimbursement Review Board. Defendant has delegated his "own motion" review of decisions of the PRRB (42 U.S.C. § 1395oo(f)) to the Administrator. On March 24, 1978, the Administrator issued a decision that:

a. The decision of the Provider Reimbursement Review Board on Issue 1 is reversed. The loss claimed by the Provider on its buildings and equipment may not be reimbursed under the program.

b. The decision of the Provider Reimbursement Review Board on Issue 2 is modified. The recovery of excess accelerated depreciation over straight-line depreciation for all years that the Provider participated in the program is proper, as held by the Board. However, the Board's decision is modified to require that this recovery be determined after giving effect to the Administrator's decision on Issue I.

c. The decision of the Provider Reimbursement Review Board on Issue 3 is reversed. The payments made by the Provider to the State of Indiana after December 31, 1974, for unemployment compensation may not be included in the Provider's allowable costs.

d. The decision of the Provider Reimbursement Review Board on Issue 4 is modified. The payments made for pension plan vesting and administrative costs after December 31, 1974, are reasonable costs related to patient care and incurred in the cost reporting period ending December 31, 1974. The payments made by the Provider after December 31, 1974, for pension plan vesting and administrative costs, contrary to the holding of the Board, were not direct administrative costs related to settlement of reimbursement incurred after termination. Further, portions of these costs may not be allocated back to prior cost years.

e. The decision of the Provider Reimbursement Review Board on Issue 5 is modified. The reimbursement to the Provider for the cost reporting period ending December 31, 1974, is limited to the Provider's customary charges, as held by the Board. The Board's decision is modified to require that all payments made by the Provider after December 31, 1974, for unemployment compensation costs must be removed from reasonable costs. Further, payments for pension plan vesting and related administrative costs made after December 31, 1974, are includable in reasonable costs of the Provider as costs incurred during the period ending December 31, 1974, and may not be removed from the reasonable costs prior to the cost/charge comparison. (Record at 3–42).

1.29 The decision of the Administrator constituted the final administrative action of Defendant, whereupon Plaintiff petitioned the Court for review of the administrative action.

1.30 On July 11, 1979, Defendant filed a Motion to Stay Proceedings pending an appellate decision in *Sisters of St. Francis Health Services, Inc., d/b/a St. Anthony Hospital v. Califano*, Appeal No. 79–1648 (D.C.Cir.), a case involving another facility operated by Plaintiff. The United States Court of Appeals for the District of Columbia decided that appeal on July 25, 1980. Defendant's Supplemental Memorandum in Support of Defendant's Motion for Summary Judgment notes that one issue in that case was the proper application of the limitation on reimbursement to the lesser of reasonable costs or customary charges, and Defendant admits that the issue of the application of that limitation to costs reported on Plaintiff's final cost report, but which are attributable to prior cost reporting periods, is resolved. The United States Court of Appeals affirmed the decision of the District Court that "reasonable cost" would exclude that portion of costs incurred in the final year which are attributable to services rendered in prior years.

## II.

## CONCLUSIONS OF LAW

2.1  42 C.F.R. § 405.415(a) states:

. . . an appropriate allowance for depreciation on buildings and equipment used in the provision of patient care is an allowable cost.

For the Medicare cost reporting period involved, 42 C.F.R. § 405.415(f) stated:

Gains and losses realized from the disposal of depreciable assets while a provider is participating in the program, or within one year after the provider terminates participation in the program, are to be included in determination of allowable cost.

The Provider Reimbursement Manual, HIM–15, Section 130, states:

Depreciable assets may be disposed of through sale, trade-in, scrapping, exchange, theft, wrecking, fire or other casualty. In such cases, depreciation can no longer be taken on the asset, and gain or loss on the disposition must be computed.

Where an asset has been retired from active service, but is being held for standby or emergency services, depreciation may continue to be taken on such assets. However, where the asset has been permanently retired or there is little or no likelihood that it can be effectively used in the future, no further depreciation can be taken on the asset. In such case, gain or loss on the retirement must be computed.

The Provider Reimbursement Manual, HIM–15, Section 104.17, states:

The depreciable life of an asset is its expected useful life to the provider; not necessarily the inherent useful or physical life. The useful life is determined in the light of the provider's experience and the general nature of the asset and other pertinent data. Some factors for consideration are: (a) normal wear and tear, (b) obsolescence due to normal economic and technological advances, (c) climatic and other local conditions, and (d) providers' policy for repairs and replacement.

Based upon the evidence of record, the Court concludes that the condition of Plaintiff's facility was one of deterioration and obsolescence. In spite of efforts to realize salvage value by putting the facility on the market, no offers had been received over a two and one-half year period. At the time of the administrative hearing an option to purchase the property for $300,000.00 was outstanding which included land appraised at approximately $120,000.00 in 1974. The option had been extended beyond its original terms and was expressly subject to the option holder obtaining certain commitments from the Department of Housing and Urban Development, which had imposed requirements for substantial improvements to the property. Except for such moveable equipment as has been sold or transferred, the land itself is the only asset of any value and, in spite of an effort to

sell, the remaining depreciable assets had and have no more than scrap value and should be considered abandoned in conformity with 42 C.F.R. § 405.415(f) and Section 130 of the Provider Reimbursement Manual. The facility, for all practical purposes, was abandoned within one year of termination. To maintain that the facility was not abandoned because it remained on the market under these circumstances is to exalt form over substance.

2.2   42 C.F.R. § 405.415(d)(3) states:

When a provider who has used an accelerated method of depreciation with respect to any of its assets terminates participation in the program, or where the health insurance portion of its allowable costs decreases so that cumulatively substantially more depreciation was paid than would have been paid using the straight-line method of depreciation, the excess of reimbursable cost determined by using accelerated depreciation methods and paid under the program over the reimbursable cost which would have been determined and paid under the program by using the straight-line method of depreciation will be recovered as an offset to current reimbursement due or, if the provider has terminated participation in the program, as an overpayment. In this determination of excess payment, recognition will be given to the effects the adjustment to straight-line depreciation would have on the return on equity capital and on the allowance in lieu of specific recognition of other costs in the respective years.

To the extent that Defendant has recaptured accelerated depreciation claimed prior to August 1, 1970, it has not attempted a retroactive application of the regulation which is contrary to Title XVIII of the Social Security Act as amended. Nothing in the text of the regulation indicates by expression or implication that a date after the actual inception of the Medicare program on July 1, 1966, may serve to limit the recovery of excess depreciation allowed under the Medicare program. The regulation identifies Medicare providers who are subject to the recapture, identifies what is to be recovered, and with the words "paid under the program," identifies the period to which the recovery is to be applied.

2.3   Section 1861(v)(1)(A) of the Social Security Act, as amended, (42 U.S.C.A. § 1395x) defines reasonable cost and sets forth the guidelines for regulations:

The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; ... Such regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this title) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

42 C.F.R. § 405.451(a) sets forth the following principle concerning costs related to patient care:

All payments to providers of services must be based on the reasonable cost of services covered under title XVIII of the Act and related to the care of beneficiaries. Reasonable cost includes all necessary and proper costs incurred in rendering the services, subject to principles re-

lating to specific items of revenue and cost. However, for cost reporting periods beginning after December 31, 1973, payments to providers of services are based on the lesser of the reasonable cost of services covered under title XVIII of the Act and furnished to program beneficiaries or the customary charges to the general public for such services, as provided for in § 405.455.

42 C.F.R. § 405.451(b)(1) and (2) define reasonable costs and necessary and proper costs as:

(b)(1) *Definitions*—(1) *Reasonable Cost.* Reasonable cost of any services must be determined in accordance with regulations establishing the method or methods to be used, and the items to be included. The regulations in this subpart take into account both direct and indirect costs of providers of services. The objective is that under the methods of determining costs, the costs with respect to individuals covered by the program will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by the program. These regulations also provide for the making of suitable retroactive adjustments after the provider has submitted fiscal and statistical reports. The retroactive adjustment will represent the difference between the amount received by the provider during the year for covered services from both title XVIII and the beneficiaries and the amount determined in accordance with an accepted method of cost apportionment to be the actual cost of services rendered to beneficiaries during the year.

(2) *Necessary and proper costs.* Necessary and proper costs are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity.

■ 42 C.F.R. § 405.451(c)(3) concerns the application of the principle on costs related to patient care:

The determination of reasonable cost of services must be based on cost related to the care of beneficiaries of title XVIII of the Act. Reasonable cost includes all necessary and proper expenses incurred in rendering services, such as administrative costs, maintenance costs, and premium payments for employee health and pension plans. It includes both direct and indirect costs and normal standby costs. However, where the provider's operating costs include amounts not related to patient care, specifically not reimbursable under the program, of flowing from the provision of luxury items or services (that is, those items or services substantially in excess of or more expensive than those generally considered necessary for the provision of needed health services), such amounts will not be allowable. The reasonable cost basis of reimbursement contemplates that the providers of services would be reimbursed the actual costs of providing quality care however widely the actual costs may vary from provider to provider and from time to time for the same provider.

The Provider Reimbursement Manual, HIM–15, Section 2122.5C, states:

Where a nonprofit provides chooses to self-insure by establishing its own reserve account, contributions to this reserve account are not allowable costs under the Medicare program....

Certain costs associated with a self-insurance program are allowable, whether paid from the fund or directly by the provider. They are:

1. Any amounts paid to reimburse the State for unemployment compensation payments actually made by the State to the former employees of the provider....

Based upon the evidence of record the Court concludes that Defendant's disallowance of unemployment compensation costs is not proper. These unemployment costs that were paid in 1975 represent reimbursement to the State of Indiana for unemployment compensation benefits paid to former employees attributable to services rendered

to Plaintiff while it was participating in the Medicare program. Therefore, these items constitute allowable costs to Plaintiff.

The unemployment benefits were earned by employees when providing services to Medicare beneficiaries and other patients. The costs were accrued at the time of notices of termination of employment which were issued prior to the date of final closing of the hospital. Even though the precise amounts of those costs were not known at the time of closing, they are costs accrued before termination. Since the benefits were a function of the duration of employment, the costs should be allocated to other years in addition to the termination year and to that extent should not be included in "reasonable cost" for the purposes of the comparison of "reasonable cost" and "customary charges."

■ 2.4 Section 1814(b) of the Social Security Act, as amended, (42 U.S.C.A. § 1395f) sets forth the following, regarding the amounts to be paid with Medicare funds to providers of services under the Hospital Insurance Program:

> (b) The amount paid to any provider of services with respect to services for which payment may be made under this part shall, subject to the provisions of section 1813, [42 U.S.C.A. 1395e] be—
> (1) the lesser of (A) the reasonable cost of such services, as determined under section 1861(v), [42 U.S.C.A. 1395x] or (B) the customary charges with respect to such services; . . .

42 C.F.R. § 405.455 sets forth the regulations pertaining to the amount of Medicare payments to be made where charges for services furnished are less than reasonable costs. Section 405.455(a) gives the following principle:

> Providers of services will be paid the lesser of the reasonable cost of services furnished to beneficiaries or the customary charges made by the provider for the same services. . . . This principle is applicable to services rendered by providers in cost reporting periods beginning after December 31, 1973 . . . .

42 C.F.R. 405.455(b)(1) and (2) give the definitions of customary charges and reasonable cost:

> (b) *Definitions.*—(1) *Customary charges.* Customary charges for services rendered to beneficiaries are the charges as defined in § 405.452(d)(4). Such charges must be recorded on all bills submitted for program reimbursement. Where the provider does not actually impose such charges in the case of most patients liable for payment for its services on a charge basis or fails to make reasonable efforts to collect such charges from patients liable for payment for its services on a charge basis, customary charges for services rendered to beneficiaries shall be the charges as defined in § 405.452(d)(4) and recorded on the bills submitted for program reimbursement reduced in proportion to the ration of the aggregate amount actually collected from patients liable for payment for services on a charge basis to the amounts that would be realized had charges consistent with the charges as defined in § 405.452(d)(4) and recorded on the bills submitted for program reimbursement been paid by or on behalf of all patients liable for payment on a charge basis.
> (2) *Reasonable cost.* For purposes of comparison with customary charges, the reasonable cost of services furnished to beneficiaries shall exclude (i) payments made to a provider as reimbursement for bad debts arising from noncollection of Medicare deductible and coinsurance amounts, (ii) amounts which represent the recovery of excess depreciation resulting from termination, or a decrease in Medicare utilization (§ 405.415(d)(3)) applicable to prior cost periods, (iii) amounts applicable to prior cost periods resulting from disposition of depreciable assets (§ 405.415(f)), and (iv) payment to funds for the donated services of teaching physicians.

From the evidence of record the Court concludes that the limitation on reimbursement to the lesser of reasonable cost or customary charges should apply to Plaintiff's termination year. There is nothing in

the law, the Committee Reports, the Regulations or the Manual Instructions to suggest such a different conclusion and the Court sees no reason to exempt a provider's final year from an otherwise reasonable protection from abuse which Congress required. The Court recognizes that a terminating provider cannot make use of the carry-forward relief incorporated in the Regulations but feels that this is an insufficient basis for assuming that terminating providers are exempt from the limitation.

The limitation applies only to *"services rendered* by providers in cost reporting periods beginning after December 31, 1973." Accordingly, the regulation notes that "amounts applicable to prior cost periods resulting from disposition of depreciable assets (§ 405.415(f))" are excluded from "reasonable cost" for purposes of comparison to "customary charges." The same exclusion applies to amounts applicable to prior cost periods for Plaintiff's unemployment compensation costs, and the pension costs and related administrative expenses.

ᵒ

### ORDER

HART, District Judge.

Upon consideration of the Motions of Plaintiff and Defendant for Summary Judgment, and upon consideration of the pleadings, record and briefs, and the arguments of counsel, and it appearing to the Court that:

this facility was constructively abandoned within one year of Plaintiff's termination of participation in the Medicare program within the meaning of 42 C.F.R. § 405.-415(f) and HIM–15 § 130; and

the recapture of accelerated depreciation claimed prior to August 1, 1970 is proper, is not a retroactive application of 42 C.F.R. § 405.415(d)(3), is not contrary to Title XVIII of the Social Security Act, as amended, is not in violation of the equal protection or due process clauses of the United States Constitution, and that any other result causes a provider to be reimbursed more than its appropriate share of depreciation expenses from Medicare funds; and

Plaintiff's unemployment compensation costs are allowable costs and are attributable in part to prior cost reporting periods, and

Plaintiff's pension plan costs and administrative costs related thereto are attributable in part to prior cost reporting periods; and

that the limitation on reimbursement to the lesser of reasonable costs or customary charges, 42 U.S.C. § 1395f(b) and 42 C.F.R. § 405.455, applies to Plaintiff's final year of operation,

it is by the Court this 27th day of May, 1981,

ORDERED, that the Decision of the Administrator of the Health Care Financing Administration be affirmed in part and reversed in part; and it is

FURTHER ORDERED, that the PRRB decision regarding Plaintiff's loss on disposal of assets and the allowability under the Medicare program of the loss engendered from such loss on disposal be reinstated and made binding upon the parties, provided such loss shall be reduced by the book value of all moveable equipment being depreciated under the Medicare program that was sold or transferred by Plaintiff; and it is

FURTHER ORDERED, that the Decision of the Administrator of the Health Care Financing Administration permitting the recovery of accelerated depreciation taken prior to August 1, 1970, is hereby affirmed; and it is

FURTHER ORDERED, that the PRRB decision regarding the allowability of Plaintiff's unemployment compensation payments and the allocation of the appropriate portion of those costs to prior cost reporting periods prior to the comparison of reasonable costs and customary charges be reinstated and made binding upon the parties; and it is

FURTHER ORDERED, that the PRRB decision regarding the allocation of the appropriate portion of Plaintiff's pension plan costs, and administrative costs relating thereto, to prior cost reporting periods prior to the comparison of reasonable costs and

customary charges be reinstated and made binding upon the parties; and it is

FURTHER ORDERED, that the decision of the Administrator of the Health Care Financing Administration applying the lesser of reasonable cost or customary charges limitation on reimbursement to Plaintiff's final year of operation is hereby affirmed; and it is

FURTHER ORDERED, that Defendant Secretary compute Medicare reimbursement payable to Plaintiff in accordance with the Court's order and to tender such sum to Plaintiff; and it is

FURTHER ORDERED, that Defendant pay to Plaintiff costs and disbursements and interest pursuant to 42 U.S.C. § 1395oo (f)(2).